**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |  |
|---|---|---|
| **NEX SJ LLC,** | ) | |
| | ) | |
| **3223 Crow Canyon Road, Suite 300** | ) | |
| **San Ramon, California 94583** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 1:26-cv-02181** |
| | ) | |
| **SIGNIA HOTEL MANAGEMENT LLC,** | ) | **Jury Trial Demanded** |
| | ) | |
| **7930 Jones Branch Drive** | ) | |
| **McLean, Virginia 22102** | ) | |
| **Serve On: Corporation Service** | ) | |
| **Company** | ) | |
| **251 Little Falls Drive** | ) | |
| **Wilmington, Delaware 19808** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**COMPLAINT**

Plaintiff, NEX SJ LLC ("Plaintiff"), brings this Complaint against Defendant, Signia Hotel Management LLC ("Signia" or "Defendant"), for breach of a written Branding and Management Agreement, as amended, ("BAMA") governing the Signia San Jose Hotel. A true and correct copy of the BAMA is attached as Exhibit 1. Plaintiff seeks damages, interest, costs, and such other relief as the Court deems just and proper, and it is entitled to a trial by jury on all issues so triable.

**INTRODUCTION**

1. This breach-of-contract action arises from Signia's commercially unreasonable course of conduct throughout Plaintiff's year-long restructuring efforts, including conduct that prevented Plaintiff from pursuing one restructuring strategy, directing them toward another that

depended upon Defendant's own performance, and ultimately caused the collapse of the refinancing and foreclosure of a landmark hotel property valued at approximately $315 million.

2.      The BAMA required Signia to act in a commercially reasonable manner, including by not unreasonably delaying required approvals and execution of documents and by providing further assurances reasonably necessary to give effect to the agreement.

3.      When timing was crucial, and foreclosure imminent, Signia failed to execute and deliver required and customary documents despite having ample time and authority to do so, preventing a pending refinancing from closing and directly causing the loss of the Hotel.

## JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      Venue is proper in this Court pursuant to § 19.4 of the BAMA, which provides that any action brought pursuant to the Agreement must be brought in the United States District Court for the Eastern District of Virginia, in Alexandria, Virginia, if that court has subject-matter jurisdiction.

6.      Defendant consented to personal jurisdiction and venue in this Court in § 19.4 of the BAMA and waived any objection that venue in this Court is improper.

7.      This action arises under the BAMA, and seeks relief only for alleged breaches of that Agreement.

## PARTIES

8.      Plaintiff NEX SJ LLC is a Delaware limited liability company whose sole member is RDNWD LLC.

2

9.      RDNWD LLC is a Delaware limited liability company whose sole member is FMT SJ Holdings LLC.

10.      FMT SJ Holdings LLC is a Delaware limited liability company whose sole member is Eagle Canyon Capital, LLC.

11.      Eagle Canyon Capital, LLC is a Delaware limited liability company whose sole member is Sam Hirbod, an individual.

12.      Mr. Hirbod is a Florida citizen and resident. At all relevant times, Plaintiff acted through its principal, Mr. Hirbod, and in coordination with affiliated entities participating in the refinancing transaction. Accordingly, references herein to communications made to, or actions taken by, "Plaintiff" include communications made to and actions taken by Mr. Hirbod and Plaintiff's affiliated entities on Plaintiff's behalf in connection with the refinancing, unless the context indicates otherwise.

13.      Defendant Signia is a Delaware limited liability company and is a signatory to the Branding and Management Agreement at issue.  Upon information and belief, Signia's sole member is Hilton Domestic Operating Company Inc., a Delaware corporation with its principal place of business in Virginia. Accordingly, Defendant is a citizen of Delaware and Virginia for purposes of 28 U.S.C. § 1332.

## FACTUAL ALLEGATIONS

### *The Branding and Management Agreement (the "BAMA")*

14.      Plaintiff and Defendant are parties to a written Branding and Management Agreement pursuant to which Signia serves as the "Manager" of the Signia San Jose Hotel and is responsible for, among other things, the branding, management, and operation of the Hotel in accordance with the Agreement.

3

15.     Plaintiff and Defendant entered the BAMA on November 8, 2021.

16.     As Manager, Signia is vested with authority and discretion over approvals, consents, and documentation required in connection with transactions affecting the Hotel, including financing transactions, and the BAMA imposes express obligations governing how that authority must be exercised.

17.     Section 22.11 of the BAMA provides that a party, including the Manager, "may not unreasonably withhold, delay or impose any unreasonable conditions on any consent, approval, agreement or other similar action required under this Agreement unless this Agreement expressly provides otherwise."

18.     The BAMA further requires cooperation in effectuating contemplated transactions. Section 22.8 (Further Assurances) provides that the parties:

> will do and cause to be done all acts, and execute and deliver all documents and instruments, reasonably necessary for each of them to perform their respective obligations under, and to give effect to the transactions contemplated by, this Agreement.

19.     The BAMA contemplates mortgage financing affecting the Hotel and the execution of customary subordination and non-disturbance documentation in connection with such financing. *See* BAMA, § 13.2.13. Section 13.2.13 further states that contemplated subordination and non-disturbance agreements must be "in a form approved by Manager," contemplating the Manager's involvement in finalizing such documentation.

20.     These provisions collectively require Signia to act in a commercially reasonable manner, to timely execute and deliver required documents, and to cooperate in good faith to effectuate transactions contemplated by the Agreement.

21.    Those obligations do not permit Signia to withhold or delay any action in a manner that would frustrate transactions contemplated by the BAMA or destroy the counterparty's bargained-for benefits.

22.    These provisions exist because hotel financing requires cooperation between the owner, lender, and manager. Without timely execution of management-related documents, financing transactions contemplated by the BAMA cannot occur.

23.    "Affiliates" is further defined in the agreement as "any person or entity which, directly or indirectly, controls, is controlled by, or is under common control with, the subject entity."  BAMA Part A: Definitions.

24.    Hilton Domestic Operating Company Inc., was at all relevant times an affiliate of Signia. Plaintiff communicated with Signia through its affiliates and representatives, including Charlie Ruehr (Vice President of Corporate Finance and Investor Relations for Hilton) and others.

25.    In connection with the execution of the BAMA, Mr. Hirbod and certain entities related to Plaintiff also entered into separate reimbursement and guaranty agreements with Hilton Worldwide Holdings Inc., the corporate parent of Defendant. Those agreements involve different parties and impose distinct obligations. In related litigation, the Court has determined that those agreements are separate from the BAMA and are not governed by its dispute-resolution provisions, and Plaintiff pleads consistently with that ruling for purposes of this action.

26.    Plaintiff does not assert claims in this action under any reimbursement or guaranty agreement and do not seek to enforce or interpret those agreements. They are referenced solely to provide factual context regarding the parties' commercial relationship and the direct damages caused by Defendant's breach of the BAMA. Plaintiff demands a trial by jury on all issues so triable and expressly reserves any right to a jury trial not waived by contract.

27.     The BAMA contains a provision requiring mediation as a condition precedent to litigation. Pursuant to § 19.3.3 of the BAMA, Plaintiff provided Defendant with written notice detailing the nature of the dispute and Plaintiff's claims arising from Defendant's failure to perform its contractual obligations. Following receipt of that notice, Defendant invoked the contractual mediation process, and the parties participated in a private mediation before JAMS on June 5, 2026. Although the mediation did not resolve the dispute, the parties thereafter participated in a full-day settlement conference before United States Magistrate Judge John F. Anderson on July 10, 2026, in a further effort to resolve their dispute.

28.     Plaintiff has therefore satisfied the mediation condition precedent and all applicable pre-litigation notice requirements under the BAMA, and this action is properly before the Court.

### *Signia's Participation in Plaintiff's Restructuring Efforts*

29.     At all relevant times, the Hotel's capital structure consisted primarily of a senior mortgage loan held by BrightSpire Capital, Inc. ("BrightSpire") and a subordinate mezzanine loan that Hilton later acquired from JPMorgan.

30.     Throughout 2024, Plaintiff actively explored multiple restructuring alternatives designed to preserve the Hotel and avoid foreclosure. Plaintiff's restructuring efforts focused on preserving the Hotel by reducing leverage, restructuring the capital stack, and refinancing the senior indebtedness.

31.     As early as August 2024, Plaintiff advised Signia that it had invested substantial equity in the Hotel and that foreclosure would wipe out that equity. Plaintiff further advised Signia that it was actively pursuing a restructuring of the capital stack to preserve the asset and that failure to do so would result in the loss of the property.

32.     One such restructuring alternative involved acquiring or substantially paying down the subordinate mezzanine loan. Plaintiff believed that acquiring or substantially reducing the mezzanine debt at a discount would simplify the Hotel's capital structure, reduce overall leverage, expand the universe of institutional lenders willing to refinance the senior debt, improve available financing terms, and materially increase the likelihood of preserving the Hotel.

33.     During Plaintiff's discussions with Signia, Charlie Ruehr (Vice President of Corporate Finance and Investor Relations for Hilton), outlined potential purchase structures and pricing with Plaintiff concerning the Mezzanine Loan.

34.     Thereafter, Hilton represented both orally and in writing to Plaintiff that Hilton's legal department had analyzed the governing intercreditor agreement and determined Plaintiff was not permitted to purchase or pay down the Mezzanine Loan without BrightSpire's consent. Hilton further represented that BrightSpire's consent would effectively require satisfaction of the senior indebtedness as part of the transaction.

35.     Plaintiff reasonably relied on those representations because Hilton owned the Mezzanine Loan, had represented that its legal department had analyzed the governing agreements, and was the contractual counterparty whose consent would be required for such a transaction.

36.     As a direct result of those representations, Plaintiff abandoned its strategy of purchasing or substantially paying down the Mezzanine Loan and instead continued pursuing a substantially more complex refinancing structure in which Hilton actively participated and encouraged.

37.     Throughout the restructuring process, Hilton representatives, including Mr. Ruehr, also encouraged Plaintiff to continue pursuing consensual refinancing efforts rather than alternative courses of action. Hilton represented that it was not planning to pursue personal

7

enforcement of the Reimbursement Agreement or Guaranties against Plaintiff and instead intended to work cooperatively with Plaintiff to preserve the Hotel and achieve a refinancing or other consensual resolution. Hilton simultaneously characterizing a potential Chapter 7 bankruptcy filing as a "declaration of war." Plaintiff relied on those representations in continuing to pursue refinancing rather than other restructuring alternatives.

38.     Hilton's representations materially altered Plaintiff's restructuring strategy and the path by which Plaintiff attempted to preserve the Hotel.

### *Signia's Knowledge of the Refinancing Timeline and Foreclosure Risk*

39.     Following Hilton's representations concerning the Mezzanine Loan, Plaintiff continued pursuing a comprehensive refinancing designed to satisfy the senior mortgage debt, restructure the remaining indebtedness, and preserve the Hotel.

40.     Because the alternative strategy of materially reducing or retiring the Mezzanine Loan had been abandoned based on Hilton's representations, Plaintiff was required to pursue a significantly more complicated refinancing involving multiple institutional lenders, subordinate financing, Hilton-controlled approvals, and satisfaction of numerous closing conditions.

41.     By April 2025, the parties knew that foreclosure would take place on Monday, May 12, 2025, absent a refinancing.  But Plaintiff succeeded in obtaining satisfactory refinancing commitments that would avoid foreclosure.

42.     The refinancing required routine, contemplated documentation from the Manager, including an Assignment of Management Agreement, Subordination, Non-Disturbance and Attornment Agreement (SNDA) and an Assignment, Assumption and Amendment of Management Agreement (Second Amendment to the BAMA). Such documents were expressly

contemplated by the BAMA's financing and subordination framework and routine in hotel financings.

43.    Although documents of this nature are sometimes finalized following closing in other transactions, the anticipated new senior lender, Bridge Investment Group ("Bridge") specifically required execution and delivery of the SNDA, Assignment and Assumption Agreement, and Second Amendment before funding this transaction.

44.    The SNDA, for one, is important to the lender because it defines the relationship with a hotel manager in case of foreclosure and protects the lender in such a circumstance.

45.    Bridge informed both Plaintiff and Defendant that execution and delivery of the SNDA, Assignment and Assumption Agreement, and Second Amendment were conditions precedent to funding.  And Bridge repeatedly communicated those requirements to Hilton's representatives.

46.    Signia and Hilton knew that Bridge required execution and delivery of such documents before funding the transaction.

47.    Throughout the refinancing process, Plaintiff's principal, Sam Hirbod, communicated directly and repeatedly with Charlie Ruehr, Vice President of Corporate Finance and Investor Relations for Hilton, regarding the status of the refinancing, the documentation required from Defendant, and the timing constraints imposed by the senior lender and the scheduled foreclosure.

48.    Throughout April and early May 2025, Signia, through its affiliates, executives, and counsel, reviewed, commented upon, and controlled the timing of execution and delivery of the transaction documents required to consummate the refinancing, including the SNDA, the Assignment and Assumption of Management Agreement, and the Second Amendment to the

9

BAMA. Signia knew that timely execution and delivery of those documents was required for the refinancing to close before the scheduled foreclosure sale.

49.     By April 2025, Bridge had substantially completed underwriting, approved the proposed financing, completed third-party diligence, and was proceeding toward closing.  Bridge stood ready to fund upon satisfaction of the remaining closing conditions, including execution and receipt of the Signia-controlled documents.

### *Defendant's Unreasonable Delay Despite Knowledge of Consequences*

50.     On or about March 31, 2025, more than five weeks before the scheduled May 9 closing, Signia circulated a draft of the SNDA to Plaintiff that Signia had drafted for use in connection with the contemplated refinancing. When circulating the draft, Signia represented that it had already been "heavily negotiated" and was "really not meant to be an opening draft for a back/forth," indicating that Signia viewed the document as substantially complete and not requiring further substantive negotiation.

51.     Signia was aware that the refinancing was scheduled to close on Friday, May 9, 2025, and that execution and delivery of the SNDA, the Assignment and Assumption of Management Agreement, and Second Amendment by that date was a condition to closing and funding.

52.     Signia was further aware that failure to close by May 9 would permit the senior lender to terminate its funding commitment and proceed with a foreclosure sale shortly thereafter.

53.     By May 9, 2025, Signia had possessed the SNDA for more than five weeks before the scheduled closing and had ample opportunity to finalize, execute, and deliver the required documents.

54.     Despite its knowledge that the refinancing was scheduled to close on Friday, May 9, 2025, and that execution and delivery of the SNDA, the Assignment and Assumption of Management Agreement, and Second Amendment by that date was required for closing, Defendant failed to timely execute and deliver the documents.

55.     The transaction had otherwise progressed to the point that closing logistics were underway, and Bridge again confirmed on May 9, 2025 that they were ready to fund the refinancing contingent on receipt of the outstanding executed documents.

56.     Defendant's failure to execute and deliver the required documents by May 9 caused the refinancing to fail to close as scheduled and permitted the senior lender to terminate its funding commitment.

57.     After the missed May 9 closing, and in an extraordinary last-minute effort to avoid foreclosure, Plaintiff advised Signia that any remaining possibility of salvaging the transaction would require immediate execution and delivery of the documents over the weekend. Plaintiff further advised that the senior lender had made clear it intended to proceed to foreclosure if the refinancing could not close promptly.

58.     As a result of these communications, Signia knew the refinancing had failed to close as scheduled and that any further delay in execution and delivery of the documents would render performance ineffective and foreclosure imminent.

59.     Notwithstanding those communications, Defendant did not execute and deliver the required documents at any time before the foreclosure.  Rather, on Sunday evening, May 11, 2025, two days after the scheduled closing date and after the senior lender had terminated its funding commitment, Defendant circulated unsigned updated versions of the SNDA and related management agreement documents.  The SNDA contained no material changes to the substantive

11

business terms from the draft Defendant had circulated more than a month earlier.  The absence of any material changes supports the inference that the delay was not attributable to unresolved business issues concerning the SNDA, but rather Defendant's failure to timely execute and deliver documents necessary to permit the refinancing to close.

60.     Defendant knew that its circulation of unsigned documents on May 11, 2025, meant the refinancing could no longer close and foreclosure was unavoidable.

61.     During the final days preceding the scheduled May 9, 2025 closing, Plaintiff repeatedly requested execution of the required documents. In response, Defendant, acting through its representatives, advised Plaintiff that the documents could not be executed because the authorized executive or signatory was out of the country and unavailable. This explanation was inconsistent with Defendant's prior conduct, including its representation that the documents had already been heavily negotiated, and with Defendant's subsequent circulation of substantially similar draft documents after the scheduled closing had already failed.  Signia's "signatory out of the country" excuse is not a Force Majeure Event.  And, in any event, the Force Majeure clause excuses only performance other than "the payment of money" and requires reasonable mitigation.

62.     The senior lender foreclosed on the Hotel on May 12, 2025.  As a result, Plaintiff lost all equity in the Hotel.

63.     Plaintiff alleges that Defendant's explanation for its failure to timely execute the documents is inconsistent with Defendant's own contemporaneous communications, including its prior representation that the SNDA had already been heavily negotiated and was not intended for further substantive negotiation, and with the fact that the SNDA ultimately circulated after the missed closing contained no material changes to the substantive business terms from the draft Defendant had provided more than a month earlier.

64.    Defendant had the contractual obligation and ability to ensure timely performance, but chose not to do so.

65.    Defendant's delay was outcome-determinative and prevented the refinancing from closing.

66.    Timely execution was essential to effectuate the transaction contemplated by the BAMA. Defendant never cured its breach and failed to deliver executed documents before the foreclosure occurred.

### *Resulting Harm*

67.    As a direct and foreseeable result of Defendant's breach of the BAMA and the implied covenant of good faith and fair dealing, Plaintiff lost ownership of the Hotel, lost hundreds of millions of dollars in equity, lost refinancing opportunities, lost the opportunity to pursue a materially less leveraged restructuring, lost the opportunity to acquire or substantially reduce the Mezzanine Loan, incurred substantially increased financing costs, became exposed to substantial guaranty and reimbursement claims, incurred substantial legal expenses, and suffered direct damages in amounts to be proven at trial.

68.    These injuries were the natural, foreseeable, and direct result of Defendant's course of conduct, which prevented Plaintiff from pursuing a commercially reasonable restructuring strategy, directed Plaintiff toward an alternative refinancing that depended upon Defendant's own timely performance under the BAMA, and then prevented that refinancing from closing through Defendant's failure to timely perform its contractual obligations.

## COUNT I

## BREACH OF CONTRACT

### *(Against Signia Hotel Management LLC)*

69.     Plaintiff realleges and incorporate paragraphs 1-68 as if fully set forth herein.

70.     The BAMA is a valid and enforceable contract governed by New York law binding Plaintiff and Defendant.

71.     Defendant breached the BAMA, including §§ 22.8 (Further Assurances) and 22.11 (Unreasonable Delay of Consents and Approvals), by (a) failing to timdfdfely execute and deliver required consents, approvals, and execution of documents in violation of § 22.11; and (b) failing to timely execute and deliver documents reasonably necessary to give effect to the refinancing transaction contemplated by the BAMA, in violation of § 22.8.

72.     Defendant's breaches were material, and, by failing to timely perform the obligations necessary to consummate the alternative refinancing, Defendant deprived Plaintiff of the benefits of the BAMA, and directly and foreseeably caused Plaintiff's damages, including, *inter alia*, causing the refinancing to fail, resulting in the foreclosure of the Hotel.

73.     As a result of Defendant's breaches, Plaintiff has suffered damages in an amount to be proven at trial.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### *(Against Signia Hotel Management LLC)*

74.     Plaintiff realleges and incorporate paragraphs 1-73 as if fully set forth herein.

75.     Under New York law, every contract includes an implied covenant of good faith and fair dealing, which requires that each party refrain from exercising contractual discretion or

acting in a manner that, while not expressly prohibited by the contract, would deprive the other party of the fruits of the agreement or frustrate its justified expectations.

76.   The BAMA vested Defendant with substantial contractual discretion over approvals, consents, the timing and execution of transaction documents, and other matters affecting financing transactions involving the Hotel. Plaintiff reasonably expected Defendant to exercise that discretion honestly, in good faith, and in a commercially reasonable manner so as not to frustrate transactions contemplated by the BAMA.

77.   Defendant breached the implied covenant of good faith and fair dealing by exercising its contractual discretion in a manner that was arbitrary, commercially unreasonable, and inconsistent with Plaintiff's justified expectations, including by:

(a) falsely representing that Plaintiff was not permitted to purchase or substantially pay down the Mezzanine Loan without BrightSpire's consent, thereby preventing Plaintiff from pursuing a commercially reasonable restructuring alternative;

(b) encouraging Plaintiff to abandon that strategy and instead continue pursuing a refinancing that Defendant knew depended upon its own timely cooperation and performance;

(c) continuing to encourage Plaintiff to pursue that refinancing while discouraging alternative restructuring options, including bankruptcy;

(d) delaying or failing to timely provide approvals and execute documents required to consummate the refinancing, despite knowing the refinancing could not close without Defendant's performance and that foreclosure would result if the transaction failed to close;

and

(e) otherwise exercising its contractual authority in a manner that frustrated the transactions contemplated by the BAMA and deprived Plaintiff of the benefits of its bargain.

78.   Defendant's conduct ultimately demonstrates an effort to subvert the BAMA and its purpose, as the direct and foreseeable consequence of Defendant's conduct was the Hotel's foreclosure.

15

79.     Defendant's conduct frustrated Plaintiff's reasonable expectations under the BAMA, prevented Plaintiff from pursuing commercially reasonable alternatives to preserve the Hotel, caused the refinancing to fail, and directly and proximately caused Plaintiff's damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NEX SJ LLC respectfully requests judgment against Defendant Signia Hotel Management LLC as follows:

A.     Compensatory direct damages in an amount to be proven at trial;

B.     Pre- and post-judgment interest as permitted by law;

C.     Costs of suit; and

D.     Such other and further relief as the Court deems just and proper, including reasonable attorneys' fees and expenses.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: July 20, 2026                              Respectfully submitted,

                                                        */s/Laurin H. Mills*
                                                  Laurin H. Mills (VA 79847)
                                                  **WERTHER & MILLS, LLC**
                                                  2121 Eisenhower Avenue, Suite 608
                                                  Alexandria, VA  22314
                                                  laurin@werthermills.com
                                                  (703) 547-4693


                                                  **GERAGOS & GERAGOS, APC**

                                                  Mark Geragos (*pro hac vice forthcoming*)
                                                  mark@geragos.com
                                                  644 South Figueroa Street
                                                  Los Angeles, CA 90017

Tina Glandian (*pro hac vice forthcoming*)
tina@geragos.com
256 5th Avenue
New York, NY 10001
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
Telephone: (213) 625-3900
Facsimile: (213) 232-3255

*Counsel for Plaintiff NEX SJ LLC*